IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ROBERT SZATHMARY, et al.,          :

    Plaintiffs,          :

v.          :
                      Civil Action No. GLR-14-2224
TOWN OF ELKTON, et al.,          :

    Defendants.

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants', Sergeant Scott Knauer, Sergeant Jason Hoffman, Officer Thomas Newton, Officer Matthew Nussle, Officer Lindsey Ziegenfuss (the "Officers"),[1] and Town of Elkton, Motion for Summary Judgment (ECF No. 36). Also before the Court is Plaintiffs', Robert and Alyce Brooke Szathmary, Cross Motion for Summary Judgment (ECF No. 37). This 42 U.S.C. § 1983 action arises from the Officers' traffic stop of the Szathmarys in Elkton, Maryland and the Officers' subsequent detention of Robert Szathmary. The Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2016). For the reasons outlined below, the Court will grant Defendants' Motion and deny the Szathmarys' Motion.

---

[1] The Court will direct the Clerk to amend the case caption to reflect the full names and correct spellings of Sergeant Scott Knauer, Sergeant Jason Hoffman, Officer Thomas Newton, Officer Matthew Nussle, and Officer Lindsey Ziegenfuss.

## I.     BACKGROUND[2]

### A.     Newton's Stop of the Szathmarys

On June 11, 2012, at approximately 10:10 p.m., Newton was doing speed enforcement on Route 40 in Elkton, Maryland, between Landing Lane and a bridge to the west. (Newton Dep. 19-20, Feb. 18, 2016, ECF No. 36-3).  The Szathmarys, driving a Chevrolet Impala, passed Newton traveling forty-seven miles per hour, two miles above the speed limit.  (Newton Dep. 22, 25).  Newton began following the Szathmarys and pulled them over soon after. (Id. at 24).  After stopping the Szathmarys, Newton approached the passenger's side of their car.  (Compl. ¶ 34, ECF No. 1).[3] Newton informed the Szathmarys that their license plates were registered to a Nissan, rather than a Chevrolet, and that they were going forty-seven miles per hour where the speed limit was forty-five miles per hour.  (Robert Szathmary Dep. 99-100, Feb. 17, 2016, ECF No. 36-10; Alyce Szathmary Dep. 13-14, Feb. 17, 2016, ECF No. 36-11).  Newton asked Mr. Szathmary for his driver's license and registration.  (Newton Dep. 28).

While waiting for Mr. Szathmary to provide the car's registration, Newton began asking the Szathmarys other questions, including where they were going and why they had a

---

[2]  Unless otherwise indicated, the following facts are uncontroverted.

[3]  To the extent the Court discusses facts that the Szathmarys allege in their Complaint, they are uncontroverted as well.

baseball bat in the car.   (Id. at 31).   They said they were going to Lewes, Delaware or Cape May, New Jersey.   (Id. at 31-32).   After giving the registration to Newton, Mr. Szathmary informed Newton that his driver's license was in the trunk. (Id. at 30).   After Newton told Mr. Szathmary to get his driver's license from the trunk, Mr. Szathmary advised Newton that there were also two unloaded firearms in the trunk. (Compl. ¶¶ 39, 40).   Newton called for backup.   (Newton Dep. 43).

**B.    The First Search**

Between 10:16 p.m. and 10:22 p.m., Ziegenfuss, Nussle, Nussle's K-9 dog Rommel, and Officer Leffew arrived.[4]   (Cross Mot. Summ. J. Ex. 6 ["CAD Report"] at 2, ECF No. 38-6).   Newton brought Mr. Szathmary to the trunk, Mr. Szathmary gave Newton permission to open the trunk, and Mr. Szathmary gave Newton his driver's license.   (Newton Dep. 46).   Newton secured Mr. Szathmary's handguns.   (Id. at 45-46).   Newton called dispatch and relayed the handguns' serial numbers at 10:22 p.m.   (Id. at 49; CAD Report at 2).   He also observed loose ammunition in the car's passenger compartment.   (Newton Dep. 58-59).   Shortly thereafter, Newton asked Nussle to do a K-9 scan of the Szathmarys' car for drugs.   (Cross Mot. Summ. J. at 8, ECF No. 38; Nussle Dep. 36, Feb. 18, 2017, ECF No. 36-5).   Nussle

---

[4] Leffew is not a defendant in this case.

brought Rommel to the Szathmarys' car for the K-9 scan. (Nussle Dep. 36-39). Rommel alerted near the car's passenger-side door handle to the presence of drugs. (Id. at 39-41).

After Rommel alerted, Newton searched the Szathmarys' car by performing a "lunge, reach, grab" search of the front and rear passenger compartments, the areas underneath the seats, the glove compartment, the center console, and the floor of the back seats (the "First Search"). (Newton Dep. 78-79). He did not find anything illegal. (Id. at 80). During the search at 10:32 p.m., and again at 10:36 p.m., one of the Officers called dispatch and told dispatch the vehicle identification number (VIN). (CAD Report at 2). At 10:36 p.m., dispatch informed Newton that there was no discrepancy with the car's registration after all. (Cross Mot. Summ. J. at 9). With Hoffman's permission, Newton decided nonetheless to bring the car to the police station for another search. (Newton Dep. 80; Hoffman Dep. 16, Feb. 19, 2016, ECF No. 36-8). Ziegenfuss patted down Mrs. Szathmary and handcuffed her. (Ziegenfuss Dep. 42-43, Feb. 19, 2016, ECF No. 36-7). Ziegenfuss drove Mrs. Szathmary to the Elkton police station. (Id. at 41). Newton drove Mr. Szathmary to the police station. (Newton Dep. 81-82). By this point, the length of the traffic stop was approximately thirty minutes. (Robert Szathmary Dep. 67; Alyce Szathmary Dep. 22).

C.  **The Second Search**

At the police station, Ziegenfuss told Mrs. Szathmary she was released.  (Alyce Szathmary Dep. 24).  Mrs. Szathmary remained in the police station lobby.  (Id. at 24-25).  Newton, meanwhile, detained Mr. Szathmary in a holding cell.  (Newton Dep. 86).  Newton then searched the car again, this time looking underneath the hood, searching the areas around the front and back seats, feeling underneath the dashboard, opening the glove compartment, and searching the trunk (the "Second Search"). (Id. at 90-91).  Again, Newton did not find anything illegal. (Id. at 110-12).  Newton released Mr. Szathmary and returned the car to the Szathmarys.  (Id. at 103-11).  According to Newton, he released Mr. Szathmary at 12:45 a.m.  (Id. at 87).  According to the Szathmarys, however, he released Mr. Szathmary at 4:47 a.m., because they arrived in Dover, Delaware at sunrise, sunrise was at 5:47 a.m., and Dover is an hour from Elkton. (See Alyce Szathmary Dep. 34; Cross Mot. Summ. J. Exs. 9 & 10, ECF Nos. 38-9, 38-10).

D.  **Procedural History**

The Szathmarys filed the present action against Defendants on July 11, 2014.  (ECF No. 1).  In their six-count Complaint, they allege: Custom and/or Policy in Violation of Constitutional Rights Pursuant to 42 U.S.C. § 1983 (Count I); Violation of Constitutional Rights Pursuant to 42 U.S.C. § 1983 (Count II);

False Arrest (Count III); False Imprisonment (Count IV); Battery (Count V); and Attorney's Fees and Costs (Count VI). (Compl.). On April 15, 2016, Defendants moved for summary judgment on all counts. (ECF No. 36). On May 6, 2016, the Szathmarys filed a Cross Motion for Summary Judgment and opposed Defendants' Motion. (ECF No. 37). On May 20, 2016, Defendants opposed the Szathmarys' Cross Motion and filed a Reply in further support of their Motion, (ECF No. 39). On June 2, 2016, the Szathmarys filed a Reply. (ECF No. 40).

## II.  DISCUSSION

### A.  <u>Standard of Review</u>

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. <u>Ricci v. DeStefano</u>, 557 U.S. 557, 586 (2009); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986) (citing <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158-59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be

able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(3), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is a genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another."  Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) (citation omitted).

A "material fact" is one that might affect the outcome of a party's case.  Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)).  Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265.  A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable

jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

Here, the parties have filed cross-motions for summary judgment. The court, therefore, must "review each motion separately on its own merits to 'determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 62 n.4 (1st Cir. 1997)). Moreover, "[w]hen considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." Id. (quoting Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996)). This Court, however, must also abide by its affirmative obligation to prevent "factually unsupported claims and defenses" from going to trial. Drewitt v. Pratt, 999 F.2d 774, 778-79 (4th Cir. 1993) (citing Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). If the evidence presented

by the nonmovant is "merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249–50 (citations omitted).

## B.   **Analysis**

Defendants argue they are entitled to qualified immunity. The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In the Fourth Circuit, courts should apply the qualified immunity doctrine "with due respect for the perspective of police officers on the scene and not with the greater leisure and acquired wisdom of judicial hindsight." Gooden v. Howard Cty., 954 F.2d 960, 964–65 (4th Cir. 1992).

Qualified immunity "is an immunity from suit rather than a mere defense to liability." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  The United States Supreme Court has "made clear that the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that 'insubstantial claims against government officials [will] be resolved prior to discovery.'" Pearson v. Callahan, 555 U.S. 223, 231–32 (2009) (quoting Anderson v. Creighton, 483 U.S. 635, 640 n.2 (1987)). "Because the doctrine seeks to protect government officials from

9

the burdens of trial" and trial preparation, courts must resolve qualified immunity questions "at the earliest possible stage in litigation." Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324, 330 (4th Cir. 2009) (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam)) (internal quotation marks omitted).

There is a two-prong test for determining whether a government official is protected by qualified immunity: (1) whether the facts that the plaintiff has alleged or shown make out a violation of a constitutional right; and (2) whether that right was "clearly established" at the time of the purported violation. Pearson, 555 U.S. at 232 (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). A right is "clearly established" when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Cloaninger, 555 F.3d at 331 (quoting Saucier, 533 U.S. at 202). Courts have discretion to resolve these two prongs in whatever order they consider appropriate based on the circumstances of the case at hand. Pearson, 555 U.S. at 236. The answers to both prongs must be in the affirmative for a plaintiff to defeat a motion for summary judgment on qualified immunity grounds. Batten v. Gomez, 324 F.3d 288, 293-94 (4th Cir. 2003). The plaintiff bears the burden of proof on the first prong, Bryant v. Muth,

994 F.2d 1082, 1086 (4th Cir. 1993); the defendant on the second, Wilson v. Kittoe, 337 F.3d 392, 397 (4th Cir. 2003).

The Court now addresses whether any of the parties deserves judgment as a matter of law on either prong of qualified immunity's two-prong test.

**1.   Whether Newton Diligently Pursued His Investigation**

The Szathmarys bring their § 1983 claims under the Fourth Amendment to the United States Constitution.   The Fourth Amendment protects citizens against unreasonable searches and seizures and provides that "no warrant shall issue, but upon probable cause."   U.S. Const. amend. IV.   "Temporary detention" of suspects during a traffic stop by the police, "even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the [Fourth Amendment]."   United States v. Vaughan, 700 F.3d 705, 709 (4th Cir. 2012) (quoting Whren v. United States, 517 U.S. 806, 809–10 (1996)) (internal quotation marks omitted).   Because traffic stops are a "limited seizure" more akin to an "investigative detention than a custodial arrest," the Supreme Court's framework for investigative detention set forth in Terry v. Ohio, 392 U.S. 1 (1968), also applies to police conduct during traffic stops. Id. (citing United States v. Guijon–Ortiz, 660 F.3d 757, 764 (4th Cir. 2011)).

Under Terry's framework for investigative detention, traffic stops are analyzed in two steps. First, courts ask "whether the police officer's action was justified at its inception." United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 2011) (citing United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992)). Second, courts inquire "whether an officer's subsequent actions were reasonably related in scope" to the justification for the stop. Id.

Here, the parties do not dispute the first step under Terry; they agree that Newton was justified in stopping the Szathmarys for going two miles over the speed limit. Instead, the Szathmarys argue that Defendants' actions violated the second step under Terry because (1) Newton asked the Szathmarys questions unrelated to the stop, and (2) Defendants delayed checking the car's VIN to do a K-9 scan of the car for drugs. The Court disagrees.

Under Terry's second step, "a traffic stop must be reasonable both in its scope and duration." Digiovanni, 650 F.3d at 509 (citing Florida v. Royer, 460 U.S. 491, 500 (1983)). For a traffic stop to be reasonable in its duration, an officer "must diligently pursue the investigation of the justification for the stop." Id. The scope of the stop is defined by its purpose addressing "the traffic violation that warranted the stop" and "attend[ing] to related safety concerns." Rodriguez

12

v. United States, 135 S.Ct. 1609, 1614 (2015) (citing Illinois v. Caballes, 543 U.S. 405, 407 (2005)).   To accomplish the purposes of the stop, an officer may not "detain the vehicle for longer than necessary." United States v. Ortiz, 669 F.3d 439, 444 (4th Cir. 2012) (citing Caballes, 543 U.S. at 407-08).   So, the "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are -- or reasonably should have been -- completed." United States v. Williams, 808 F.3d 238, 245 (4th Cir. 2015) (quoting Rodriguez, 135 S.Ct. at 1614) (internal quotation marks omitted).   "Any detention longer than necessary to accomplish the purposes of the stop must be justified by at least a reasonable suspicion of other criminal activity." Ortiz, 669 F.3d at 444; see Caballes, 543 U.S. at 407-08.   The Court now addresses the Szathmarys' claims in turn under Terry's second step.

### i.   Newton's Questions Unrelated to the Stop

During a routine traffic stop, an officer may ask the driver for a driver's license and car registration, run a computer check, and issue a citation. United States v. Green, 740 F.3d 275, 280 (4th Cir. 2014) (quoting Rusher, 966 F.2d at 876).   An officer may also ask questions unrelated to the traffic stop without rendering the stop unlawful. Guijon-Ortiz, 660 F.3d at 766.   The unrelated questions, however, may not prolong the stop "beyond the period reasonably necessary to

effectuate the purpose" of the traffic stop.  United States v. Mason, 628 F.3d 123, 131 (4th Cir. 2010).  Ultimately, whether officers diligently pursue their investigation requires examination of "the totality of circumstances."  Digiovanni, 650 F.3d at 509 (citing United States v. Everett, 601 F.3d 484, 494 (6th Cir. 2010)).

Here, the undisputed facts show that Newton's actions met Terry's second prong.  Newton pulled the Szathmarys over because they exceeded the speed limit and because there was a registration discrepancy.  (Newton Dep. 22–23; Robert Szathmary Dep. 100; Alyce Szathmary Dep. 13–14).  Newton asked the Szathmarys some questions unrelated to this purpose, but it is uncontroverted that he did so while waiting for Mr. Szathmary to find his registration.  (Newton Dep. 31–32).  Because he asked the unrelated questions while waiting for Mr. Szathmary's registration -- which Newton is permitted to request, see Green, 740 F.3d at 280 -- the unrelated questions did not prolong the stop.  See Guijon-Ortiz, 660 F.3d at 766.  Thus, Newton's questions unrelated to the stop did not violate Terry's second prong.

### ii.  Defendants' Delay Checking the VIN

It is undisputed that Newton received Mr. Szathmary's license at 10:22 p.m.  (See Newton Dep. 46) (describing that Mr. Szathmary opened his trunk to give Newton his license and for

14

Newton to secure his handguns); (CAD Report at 2) (showing Newton called dispatch and relayed the handguns' serial numbers at 10:22 p.m.). It is also undisputed that Defendants did not begin checking the car's VIN until 10:32 p.m. (CAD Report at 2). During the intermediate ten minutes, Defendants began a K-9 scan of the Szathmarys' car for drugs. (Nussle Dep. 36-39). Defendants argue prolonging the stop by ten minutes to do a K-9 scan did not violate <u>Terry</u>'s second prong because Newton had reasonable suspicion of other criminal activity. The Court agrees.

As described above, any detention longer than necessary to accomplish the original purposes of the stop must be justified by at least a reasonable suspicion of other criminal activity. <u>Ortiz</u>, 669 F.3d at 444; <u>see</u> <u>Caballes</u>, 543 U.S. at 407-08. Reasonable suspicion is present "when an officer is able to 'point to specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity.'" <u>Id.</u> (quoting <u>United States v. Branch</u>, 537 F.3d 328, 336 (4th Cir. 2008)). The reasonable suspicion standard requires considering the totality of the circumstances, looking at all "of the facts and inferences produced by a police officer." <u>Branch</u>, 537 F.3d at 337. When looking at the totality of the circumstances, circumstances "consistent with

innocent travel can, when taken together," constitute reasonable suspicion.  Digiovanni, 650 F.3d at 511 (citing United States v. Sokolow, 490 U.S. 1, 9 (1989)).   To constitute reasonable suspicion, the innocent circumstances must "serve to eliminate 'a substantial portion of innocent travelers.'"  Id.  (quoting United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004)). Finally, when an officer has reasonable suspicion of criminal activity, the officer may detain the suspect to "permit the officer to allay the suspicion."  Ortiz, 669 F.3d at 444 (quoting Mason, 628 F.3d at 128) (internal quotation marks omitted).

Here, the uncontroverted facts establish that Newton had sufficient reasonable suspicion of criminal activity consistent with drug trafficking.[5]  Newton observed a baseball bat and loose loaded ammunition magazines in the car's passenger compartment, and he observed loose handguns in the trunk.  (Newton Dep. 26-27, 45-46, 58-59).   Newton's training advised him that drug traffickers carry weapons to protect themselves.  (Id. at 61-62); see United States v. Arvizu, 534 U.S. 266, 273 (2002) (holding that officers may rely on "specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person'"

---

[5]  The Court observes that the Szathmarys never contested whether Newton had reasonable suspicion.

in forming reasonable suspicion (quoting United States v. Cortez, 449 U.S. 411, 418 (1981))).

In addition, Newton still had not resolved the car's registration discrepancy. (Newton Dep. 41). What is more, when Newton asked where the Szathmarys were going, the Szathmarys gave inconsistent answers; they said they were going to Lewes, Delaware or Cape May, New Jersey. (Newton Dep. 32–33); see Digiovanni, 650 F.3d at 513) (holding that an unusual travel itinerary may be considered in forming reasonable suspicion (citing United States v. Brugal, 209 F.3d 353, 360–61 (4th Cir. 2000)).[6] While some of these circumstances are consistent with innocent travel,[7] taken together, they constitute sufficient reasonable suspicion because they "eliminate 'a substantial portion of innocent travelers.'" Digiovanni, 650 F.3d at 511 (quoting Foreman, 369 F.3d at 781). Thus, the Court concludes that Terry permitted Newton to detain the Szathmarys further and request a K-9 scan "to allay [his] suspicion" of drug trafficking. See id. (quoting Mason, 628 F.3d at 128).

---

[6] The Szathmarys maintain that because the Cape May ferry leaves from Lewes, Delaware, Mr. Szathmary's answer was not suspicious and that Newton's suspicion "was due to his ignorance." (Pls.' Reply at 6, ECF No. 40). It is undisputed, however, that Newton was aware that the Cape May ferry leaves from Lewes. (Newton Dep. 33). He nonetheless thought it was suspicious that the Szathmarys were not sure which location was their destination. (Id.).

[7] Indeed, the Defendants never found any drugs in the Szathmarys' car or on their person.

In sum, the undisputed facts demonstrate that Newton's questions unrelated to the stop and Defendants' delay checking the car's VIN to do a K-9 scan did not violate the Szathmarys' Fourth Amendment rights under <u>Terry</u>'s second prong. Accordingly, the Court concludes that Defendants are protected by qualified immunity for their actions and deserve judgment as a matter of law.

### 2. Whether Probable Cause "Dissipated" After Newton's First Search

The parties do not dispute that after Rommel alerted Defendants to the presence of drugs in the Szathmarys' car, they had probable cause to execute the First Search. Instead, the Szathmarys argue that Defendants violated their Fourth Amendment rights when, after no drugs were found during the First Search, Defendants took the car to the police station to execute the Second Search. The Court disagrees.

During a traffic stop, when an officer "has probable cause to believe that a car is carrying contraband," the officer may do a warrantless search of the car at the scene or later at the police station. <u>United States v. Fattaleh</u>, 746 F.Supp.599, 601 (D.Md. 1990) (quoting <u>United States v. Haley</u>, 669 F.2d 201, 203 (4th Cir. 1982)). The Szathmarys first contend that a search at the police station requires Defendants to make an arrest. But under <u>United States v. Brookins</u>, the existence of probable

cause, rather than the arrest of a suspect, is what permits a warrantless search at the police station.  See 345 F.3d 231, 238 (4th Cir. 2003) (holding that "the ongoing existence of probable cause . . . not the factual happenstance of search incident to arrest," entitles an officer to a warrantless search at the police station).

The Szathmarys next assert that because the First Search was fruitless and other "exculpatory" circumstances, probable cause "dissipated," preventing Defendants from executing the Second Search.  The Szathmarys' dissipation theory relies on only two cases with binding authority: McDaniel v. Arnold, 898 F.Supp.2d 809 (D.Md. 2012) and United States v. Grubbs, 547 U.S. 90 (2006).

In McDaniel, the Szathmarys overlook that the court was addressing how exculpatory circumstances may prevent probable cause from being established -- rather than how exculpatory circumstances may dissipate probable cause after its establishment, which is what the Szathmarys argue here.  See 898 F.Supp.2d at 842 ("[I]n order to arrive at probable cause, 'an officer may not disregard readily available exculpatory evidence of which he is aware'" (emphasis added) (citing Wadkins v. Arnold, 214 F.3d 535, 541 (4th Cir. 2000))).  And the parties do not dispute that there was probable cause for Newton to execute the First Search.

In Grubbs, the Supreme Court observed that probable cause "may cease to exist after a warrant is issued," but only after an officer learns that "contraband is no longer located at the place to be searched" or because the probable cause has grown "stale." 547 U.S. at 95 n.2. Here, Defendants never learned after the First Search that drugs were no longer located in the Szathmarys' car because Newton did not search the entire car. During the First Search, Newton did not search underneath the hood, underneath the dashboard, the glove compartment, and perhaps most significantly, the trunk; he searched these areas only during the Second Search. (Newton Dep. 91). Hence, only after the Second Search did Defendants "learn" that drugs were not located in the Szathmarys' car. At best, therefore, probable cause "cease[d] to exist" only after the Second Search. See 547 U.S. at 96.

For similar reasons, the authority outside of the Fourth Circuit that the Szathmarys rely on to advance their dissipation argument is readily distinguishable. The Szathmarys rely mostly on United States v. Bowling, 900 F.2d 926 (6th Cir. 1990), but in that case, the Sixth Circuit held that "where an initial fruitless consent search dissipates the probable cause that justified a warrant, new indicia of probable cause must exist to repeat a search of the same premises pursuant to the warrant." Id. at 932 (emphasis added). Here, searched different areas

during the Second Search – he did not repeat the First Search.[8]
Grubbs and Bowling aside, in the Fourth Circuit, once an officer
has probable cause, the officer "may search 'every part of the
vehicle and its contents that may conceal the object of the
search." United States v. Kelly, 592 F.3d 586, 590 (4th Cir.
2010) (quoting United States v. Ross, 456 U.S. 798, 825 (1982)).
The uncontroverted facts show that Newton's First Search and
Second Search did just that.  Thus, the Court concludes that
Newton had probable cause to conduct the Second Search.

In sum, the undisputed facts establish that the Second
Search did not violate the Szathmarys' Fourth Amendment rights.
Accordingly, the Court concludes that Defendants are protected
by qualified immunity for Newton's actions and deserve judgment
as a matter of law.

### 3.    **Whether Ziegenfuss Unlawfully Seized Mrs. Szathmary**

In addition to protecting a citizen's right to be free from
unreasonable searches, the Fourth Amendment protects against
unreasonable seizures.  Unus v. Kane, 565 F.3d 103, 119 (4th
Cir. 2009).  Reasonableness of a seizure "depends on a balance
between the public interest and the individual's right to

---

[8] For the aforementioned reasons, the parties' disagreement
over whether Newton conducted two searches, as the Szathmarys
contend, or whether Newton began his search on Route 40 and
simply finished the same search at the police station, as
Defendants maintain, is inconsequential.  The relevant issue is
whether there was overlap between the areas Newton searched, not
whether there was continuity between the searches.

personal security free from arbitrary interference by law officers." United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975). The Fourth Circuit has identified three categories of police-citizen interactions: (1) an arrest, which requires probable cause; (2) a brief investigatory stop, which requires reasonable suspicion; and (3) brief encounters, which do not implicate the Fourth Amendment. United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002) (internal citations omitted). The first two categories constitute Fourth Amendment "seizures." See id. A seizure occurs when, under the totality of the circumstances, "a reasonable person would not feel free to leave or otherwise terminate the encounter." Id. (citing United States v. Sullivan, 138 F.3d 126, 131 (4th Cir. 1998)). "[T]he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" Florida v. Bostick, 501 U.S. 429, 437 (1991) (quoting Michigan v. Chesternut, 486 U.S. 567, 569 (1988)).

Here, the parties do not dispute that Ziegenfuss seized Mrs. Szathmary when she placed Mrs. Szathmary in handcuffs, put her in the back of Ziegenfuss's patrol car, and took her to the police station. Defendants argue this seizure was permissible under the Fourth Amendment. The Court agrees.

Mrs. Szathmary's seizure falls between the first and second kinds of police-citizen interactions identified in Weaver: the K-9 provided probable cause of illegal drug activity, yet Ziegenfuss never formally arrested Mrs. Szathmary. In any event, Ziegenfuss's detention of Mrs. Szathmary was reasonable because Ziegenfuss had probable cause to believe Mrs. Szathmary was involved in illegal drug activity. See Jones v. Ashford, No. TDC-14-3639, 2017 WL 221783, at *5 (D.Md. Jan. 18, 2017) (concluding that plaintiff's detention was reasonable because defendant officer had probable cause to believe plaintiff had trespassed).

The Szathmarys also argue that even though Ziegenfuss released Mrs. Szathmary at the police station, she was still not free to leave because she lacked a purse, money, identification, mobile phone, or awareness of where she was. This does not constitute a seizure. When determining whether there is a seizure, courts do not consider factual circumstances unrelated to what the officer's conduct communicated to the suspect. See Bostick, 501 U.S. at 437 (quoting Chesternut, 486 U.S. at 569) (describing the test for seizure as whether the "police conduct would 'have communicated to a reasonable person that [she] was not at liberty to ignore the police presence and go about [her] business" (emphasis added)). It is uncontroverted that when they got to the police station, Ziegenfuss told Mrs. Szathmary

that she is released, and in fact, commanded her to leave.  (See Ziegenfuss Dep. 24) ("You're going to be released . . . You need to go.").

In sum, the undisputed facts establish that Ziegenfuss did not violate the Mrs. Szathmary's Fourth Amendment rights. Accordingly, the Court concludes that Defendants are protected by qualified immunity for Ziegenfuss's actions and deserve judgment as a matter of law.

**4.    Whether Newton Held Mr. Szathmary for an Unreasonable Amount of Time**

The Szathmarys' final Fourth Amendment argument is that Newton detained Mr. Szathmary for an unreasonable amount of time under the Fourth Amendment.  The Court is not persuaded.

To review, a detention may be longer than necessary to accomplish the purposes of a routine traffic stop if there is at least some reasonable suspicion of other criminal activity. Ortiz, 669 F.3d at 444.  Probable cause of this additional illegal activity permits a more intrusive seizure, including arrest.  Id. (citing Herring v. United States, 555 U.S. 135, 136 (2009)).  To assert that Mr. Szathmary's detention was unreasonably long, the Szathmarys rely on Chambers v. Maroney, 399 U.S. 42 (1970), to maintain that Mr. Szathmary's detention may only last as long as it would take Defendants to obtain a warrant.  But Chambers does not address detentions at all.  The

Szathmarys also rely on <u>Florida v. Royer</u>, 460 U.S. 491, 500 (1983), for the proposition that the scope of Mr. Szathmary's detention must be tailored for its underlying justification. <u>Royer</u>, however, addressed the scope of seizures when the detention is based on <u>less</u> than probable cause.  <u>See</u> 460 U.S. at 500 ("The reasonableness requirement of the Fourth Amendment requires no less when the police action is a seizure permitted on less than probable cause because of legitimate law enforcement interests. The scope of the detention must be carefully tailored to its underlying justification.").

The Szathmarys cite no other authority, and the Court's own exhaustive research reveals none, that address how to evaluate the reasonableness of a detention's length based on probable cause.  Ordinarily, no such guidance is needed because when circumstances give rise to probable cause for detaining a suspect, those same circumstances usually lead officers to arrest that suspect.  This typically renders the length of the preceding detention unimportant.  Here, instead, there is the unique circumstance of a K-9 scan alerting Defendants to the presence of drugs in the Szathmarys' car, yet Newton never actually finding any drugs.  As a result, Newton detained Mr. Szathmary but later releasing him without arrest.

The most analogous instance occurred in an unreported Fourth Circuit case, <u>United States v. Ramirez-Jimenez</u>, where

criminal defendant Ramirez-Jimenez was a passenger in a car that officers had probable cause to believe was involved in a drug deal.  652 F.App'x 211, 212 (4th Cir. 2016).  An officer pulled the car over and multiple officers searched the car twice.  Id. at 213.  After "just over an hour," the officers did not find any drugs and Ramirez-Jimenez was free to go.  Id.  On appeal, Ramirez-Jimenez argued the duration of the stop was "constitutionally excessive."  Id. at 214.  The Fourth Circuit held that the presence of probable cause justified the "extended stop" and "protracted detention" of the car's passengers.  Id. at 215-16.  The court, however, did not elaborate on the protracted detention's limits under the Fourth Amendment.

Here, the parties dispute how long Newton detained Mr. Szathmary.  According to Newton, he released Mr. Szathmary at 12:45 a.m.  (Newton Dep. 86-87).[9]  According to the Szathmarys, he released Mr. Szathmary at 4:47 a.m.  (See Alyce Szathmary Dep. 34 (testifying that the Szathmarys arrived in Dover at sunrise); Cross Mot. Summ. J. Exs. 9 & 10 (stating that sunrise that day was 5:47 a.m. and that Dover is a one hour drive from Elkton)).  But assessing whether either detention's length was unreasonable under the Fourth Amendment requires the Court, at

---

[9]  To the extent the Szathmarys ask the Court to make a credibility determination as to Newton's recordkeeping, the Court will not assess the credibility of a witness when considering a motion for summary judgment.

best, to apply the vague standard in <u>Ramirez-Jimenez</u>.   Because
the Fourth Circuit decided <u>Ramirez-Jimenez</u> in June of 2016, a
little over four years after Newton detained Mr. Szathmary, the
Court concludes that Mr. Szathmary's rights were not "clearly
established" at the time of Newton's purported violation.   <u>See</u>
<u>Pearson</u>, 555 U.S. at 232 (citing <u>Saucier</u>, 533 U.S. at 201).
Thus, Defendants have met their burden under the second prong of
qualified immunity.   <u>See</u> <u>Wilson</u>, 337 F.3d at 397.   Accordingly,
the Court concludes that Defendants are protected by qualified
immunity for Newton's actions and deserve judgment as a matter
of law.

     **5.   Claims under Maryland Law**

Finally, the sole remaining claims under Maryland law are
the Szathmarys' claims relating to Newton's detention of Mr.
Szathmary.   District courts may decline to exercise supplemental
jurisdiction over a state claim if "the district court has
dismissed all claims over which it has original jurisdiction."
28 U.S.C. § 1367(c)(3) (2012).   District courts "enjoy wide
latitude" in making this determination.   Shanaghan v. Cahill, 58
F.3d 106, 110 (4th Cir. 1995).   The Court declines to exercise
supplemental jurisdiction over these claims.   Accordingly, the
Court will grant Defendants' Motion and deny the Szathmarys'
Motion.

### III. CONCLUSION

For the foregoing reasons, the Court will GRANT Defendants'
Motion for Summary Judgment (ECF No. 36) and DENY Plaintiffs'
Cross Motion for Summary Judgment (ECF No. 37).  The Court will
also ENTER judgment in favor of Defendants.  A separate Order
follows.

Entered this 31th day of March, 2017

/s/
_____
George L. Russell, III
United States District Judge
